HENNESSY et al. v. TACOMA SMELTING & REFINING CO. et al.

(Circuit Court of Appeals, Ninth Circuit. March 9, 1904.)

No. 961.

1. RES JUDICATA—DECREE HOLDING JUDGMENT AN ESTOPPEL—EFFECT OF REVERSAL OF JUDGMENT PENDING APPEAL.

A decree based in whole or in part on a plea of res judicata will be reversed on appeal where pending such appeal the judgment held to constitute an estoppel has been reversed, the fact of such reversal being one of which the appellate court may take judicial notice.

2. FEDERAL COURTS—PENDENCY OF PRIOR SUIT IN STATE COURT—COMITY.

In a suit by minority stockholders, the Supreme Court of a state decided that a lease of its property by a corporation to a new corporation, which had acquired a majority of its stock, was ultra vires and void, and enjoined the old company from recognizing any vote cast by the lessee as a stockholder, on the ground that, under the laws of the state, it had no power to hold such stock. Thereupon it transferred its stock to individuals, by whose vote it was determined that the old corporation should dissolve and sell its property. The minority stockholders then commenced a second suit in a state court to enjoin such action, for the removal of the trustees, the appointment of a receiver, and the cancellation of the stock transferred by the new company; alleging that it was still, in fact, the owner thereof, and that the proposed action was in its interest, to enable it to obtain the property. Such suit having been dismissed by the court, the complainants commenced a second suit in a federal court, involving to some extent the same issues. Subsequently the judgment of the state court dismissing the suit therein was reversed on appeal by the Supreme Court of the state, and the cause remanded for trial. *Held* that, under the circumstances, the federal court should await the final action of the state courts, which had first obtained jurisdiction, before proceeding with the hearing of the case before it.

Appeal from the Circuit Court of the United States for the Western Division of the District of Washington.

On December 6, 1898, the Tacoma Smelting & Refining Company, a corporation owning and operating a smelter near Tacoma, in the state of Washington, made a lease of its entire smelting plant and all its property for a term of 10 years to the Tacoma Smelting Company, a corporation created for the purpose of taking the lease. The first company will in this opinion be designated the "old company," and the second company the "new company." The resolution to execute the lease was approved by the majority of the stockholders of the old company, but was opposed by a minority repre-

---

¶ 2. Conflict of jurisdiction between state and federal courts, see note to Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 356.

senting from 12 to 15 per cent. of the stock, who filed a written protest against the same. Shortly after its execution the minority stockholders requested the trustees of the old company to take legal proceedings to cancel the lease on the ground that it was ultra vires and void. The request was denied. Thereafter the minority stockholders commenced an action in the superior court of the state of Washington for Pierce county, suing as stockholders and in behalf of their corporation, to set aside the lease. In that action it was finally determined by the Supreme Court of Washington that the lease was ultra vires of the old corporation and void, on the ground that, at the meeting at which the resolution was adopted authorizing the lease, the majority of the stock of the old company was held and voted by the new company, the statutes of the state giving to no corporation created under its laws the power to hold stock in another corporation; also on the ground that the articles of the old company contained no expressions of the power of that company to execute a lease of its property. The judgment of the court enjoined the old company from recognizing any vote cast by the new company, or by any one in its behalf. This decision was rendered July 12, 1901. The new company at that time held 5,669 shares of the stock of the old company, out of a total of 6,776 shares. On July 20th the certificates of the shares held by the new company were by the trustees of the old company canceled, and new certificates were issued to F. W. Bradley, William Alvord, Henry Bratnober, and W. R. Rust, who were all stockholders of the new company. On December 21, 1901, these persons assigned all of said shares to Chester Thorne. Thorne took the same with full notice of the judgment in the said action. After the decision W. R. Rust, then vice president of the new company, and at the same time secretary of the old company, bought 255 shares of the stock of the old company, and on January 20, 1902, he transferred thereof to 20 persons; giving 1 share to each, and 235 shares to W. G. Hellar. On March 7, 1902, Hellar transferred 8 of the shares held by him to 8 persons. This distribution of shares was avowedly made for the purpose of securing a two-thirds majority in number of holders of shares in the old company, as well as two-thirds of the stock. The purpose was to effect a dissolution of the old company, and a sale of its property. It was at this point in the course of events that the minority stockholders, being the same persons who are the appellants in the case which is now before us, commenced a suit in the superior court of the state of Washington for Pierce county (Case No. 19,209) against the two corporations and the trustees of the old company, Browne, Oakes, Rust, Clark, Daily, Craig, and Heilig, alleging in their complaint, in brief, that, notwithstanding the decision of the Supreme Court of the state of Washington above alluded to, the new company still retained the possession of the leased property; that the trustees of the old company were merely its tools, and that as long as they remained in office no action would be taken to recover the property from the new company; that the stock held by Thorne still belonged to the new company; and that the transfer to him was a sham—and praying for relief as follows: That the trustees of the old company, Browne, Rust, Clark, Oakes, Daily, Craig, and Heilig, be restrained from acting as officers or trustees of that corporation, and that they be removed from office; that the new company and the aforesaid trustees of the old company be enjoined from tearing down or removing from the smelting plant or buildings of the old company any machinery then in the buildings, and from interfering with any of the old company's property; that a receiver be appointed to take charge of 'and manage the said property; that Thorne be enjoined from transferring his stock, and that the stock so held by him be declared void; that the old company and its officers be restrained from allowing him to vote the same; that an accounting be had with the new company, and said trustees so named, of all their doings with said property, and that they be required to restore all of the same to the old company; and that the new company account for its profits made while in possession thereof. In that suit a temporary restraining order was issued, and thereafter, on motions to extend the order pending the suit and to appoint a receiver, the court, on March 6, 1902, denied both motions and dismissed the suit for want of equity in the bill of complaint. The plaintiffs promptly

filed their motion to vacate the judgment, on the ground of irregularity in entering the same. The motion was taken under advisement, and was not decided until after the entry of the final decree in the court below in the present suit.

In the meantime, on March 7, 1902, a meeting of the stockholders of the old company was held, at which it was ordered by the holders of more than two-thirds of the stock that the corporation be dissolved, and its property sold and assets distributed. On March 19, 1902, the new company commenced an action in the superior court of Pierce county, state of Washington, against the old company, to recover judgment for $141,640.28, upon an alleged account stated on the adjustment of all matters in dispute between the two companies. Subsequently one of the minority stockholders, by leave of the court, intervened in that action, contesting the validity of the claim, and the right of the plaintiff therein to recover upon said alleged account stated. That action was still pending at the date of the entry of the decree which is appealed from in the present case. On April 25, 1903, on the motion of the plaintiff in that action, that cause was dismissed. On March 26, 1902, the stockholders who had been the plaintiffs in the action in the superior court of the state commenced the present suit in the United States Circuit Court for the District of Washington against the old company and its then directors, Browne, Oakes, Mottet, Albertson, Hellar, Thorne, and Fogg. The new company was not made a party to the suit. The bill contained many of the allegations that had been embodied in the bill of complaint in case No. 19,209 in the superior court, and it alleged that the trustees named were unfit persons to carry on the proceedings of winding up the corporation; that they were the creatures of the new company, pledged to secure it the smelting plant, and allow its claim for improvements made thereon, to which, the bill alleged, it was not entitled. It was alleged that the new company had been in the possession of the smelting plant and property of the old company under said void lease a little more than three years, and had realized large profits therefrom; that the old company had allowed a claim in the sum of $141,640.28 in favor of the new company; that the allowance of that claim and the proceedings looking to a sale of properties were part of a scheme to avoid the effect of the judgment of the superior court in which it had been declared that the lease was void, and to enable the new company to acquire the property of the old company. It prayed that the trustees named be restrained from acting as such officers of the old company or on behalf of its creditors and stockholders, and from selling or charging with a lien any of its property, and from carrying out the sale proposed to be made; that a receiver be appointed of its property; and that a liquidation of the affairs of the corporation be had through him. On September 3, 1902, the appellants filed a supplemental bill, alleging that on August 7, 1902, the board of trustees of the old company held a meeting at which they considered two bids which they had received for the smelting plant and property—one a cash bid for $250,000, the other a bid of $250,000 made by the new company; that they had accepted the latter, and had directed that a contract of sale be executed in accordance therewith; that in the contract of sale so executed it was recited that the new company had a valid claim against the old company for $141,640.28; that the new company agreed to procure assignments from the holders of not less than 5,931 shares of the stock of the old company of all dividends that may at any time be declared thereon; and that the new company was to make payment for the said purchase by receipting its bill for $141,640.28, by receipting for dividends on said 5,931 shares of stock, and by paying the sum of $31,799.72 in cash, provided that, if it should be found that it had paid too much in cash, the balance should be refunded; and, if it had paid too little, it should pay whatever further sums should from time to time be deemed necessary by the old company.

The appellees answered, and, among other defenses, pleaded that the decree of the superior court of the state of Washington in case No. 19,209 was a judicial determination of all matters and issues stated in appellants' bill. At the commencement of the suit the appellants moved for the appointment of a receiver, and for a temporary injunction enjoining the appellees

from going forward with the proposed sale. These applications were taken under advisement by the court. On July 22, 1902, the trustees of the old company having caused a new notice of sale to be given, the appellants filed their motion for an injunction to enjoin them from making the sale, and from charging with any claim the smelting plant and properties of the old company. The motion was denied upon the appellees' giving a bond to the appellants in the sum of $43,000.

Testimony was taken upon the issues, and on November 26, 1902, a final decree was entered dismissing the appellants' bill, the court ruling that the decree of the superior court in case No. 19,209 was conclusive and binding upon the parties in the present suit as to all questions which were or might have been litigated in that case: that that decision not having, in terms or in legal effect, annihilated any of the stock of the old company, nor denied the right of the new company to transfer the stock which it held, nor precluded its vendees from voting that stock, but having judicially determined that Thorne acquired a majority of the stock of the old company lawfully, the issues in the present case were therefore narrowed and limited by the plea of res judicata to the question whether the appellants were entitled to any relief in equity by reason of the facts and transactions since March 6, 1902, the date of that decree. The court confined its consideration to the relief sought concerning the election of the new board of trustees of the old company, the attempted settlement of accounts between the old company and the new, the initiation of proceedings to dissolve the old company, and the sale of its property, and the application for the appointment of a receiver. As to all these matters the court was of the opinion that the appellants were entitled to no relief. Concerning the allowance of the claim of the new company for $141,640.28, the court made no finding or special adjudication in the decree, but in the course of the opinion remarked: "All questions as to the lawfulness and righteousness or unrighteousness of the settlement referred to are or may be the subject of litigation in an action at law pending in the superior court, in which the new company is plaintiff, and is asking for a judgment for the amount of the balance so agreed to. The fact that the same controversy is involved in a pending lawsuit between the same parties in another court of concurrent jurisdiction does not oust this court of jurisdiction, and, although it may uselessly add something to the burdens of the court, the parties have a right to a hearing and decision." These remarks were made with reference to the action at law in the superior court of Pierce county, state of Washington, brought by the new company against the old to obtain judgment upon an account stated for $141,640.28. The court in the opinion proceeded thereupon to discuss that claim, and, without entering into the items of the account, expressed the opinion that the adjustment which was made was neither unfair nor unlawful. The court further said: "I have considered the propriety of retaining the case for final liquidation after the action still pending in the superior court [the action on the account stated] shall have been terminated, but to do so will delay an appeal for an indefinite time; and, in my judgment, it is expedient for the parties to have a final decree entered, which may be appealed from at once."

T. L. Stiles, E. L. Parsons, A. N. Fitch, and James M. Harris, for appellants.

Charles S. Fogg and W. H. Bogle, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

One of the assignments of error is that the court held that the judgment of the state court in case No. 19,209 operated as a bar or as an adjudication of any of the matters involved in the present case. We need not enter into a consideration of the disputed questions involved on this assignment, further than to advert to the fact that, subsequent

to the final decree rendered by the court below, the judgment so relied upon as an estoppel was reversed by the Supreme Court of the state of Washington. On November 26, 1902, the date of the entry of the final decree which is here appealed from, the suit in the state court was pending therein on the motion of the plaintiffs for an order to vacate the judgment on the ground of irregularity in entering the same. On January 2, 1903, that order was denied. The plaintiffs therein, desiring to appeal from the order, and having been denied by the trial court a statement of facts necessary for the prosecution of their appeal, applied to the Supreme Court of the state of Washington for a mandamus to the judge of the superior court, requiring him to sign the desired statement. On July 2, 1903, that application was allowed. State ex rel. Hennessy v. Huston, 72 Pac. 1015. The Supreme Court, in rendering its judgment, disapproved the ruling of the superior court that there was no equity in the complaint, and held, upon the facts alleged in the petition for the writ, that the judgment had been irregularly entered. The court issued the writ, and thereafter the desired statement was made, and the appeal was presented to the Supreme Court. On December 10, 1903, the decision of that court was rendered thereon. Hennessy v. Tacoma S. & R. Co., 74 Pac. 584. It was held that the judgment of the superior court had been prematurely entered, and it was adjudged that the judgment be reversed, and the cause remanded to the superior court, with instructions to proceed with the trial on the issues joined. It has been held that the effect of a reversal of a judgment completely destroys its efficacy as an estoppel, and that an appellate court may take judicial notice on the appeal of such a reversal occurring after the date of the decision appealed from. Butler v. Eaton, 141 U. S. 240, 11 Sup. Ct. 985, 35 L. Ed. 713. In that case the Supreme Court had before it for review on writ of error the judgment of the Circuit Court for the District of Massachusetts, in which it had been adjudged that a certain prior judgment of the Supreme Judicial Court of Massachusetts constituted an estoppel as to a portion of the amount sued for. After the date of the judgment of the Circuit Court the decision of the Supreme Judicial Court of Massachusetts was, upon writ of error from the Supreme Court of the United States, reversed. The latter court, in deciding the case of Butler v. Eaton, took judicial notice of that reversal, and said that, when the judgment so relied upon as an estoppel "was given in evidence in this case, it was effective for the purpose of a defense, but its effectiveness in that regard is now entirely annulled. * * * It is apparent from an inspection of the record that the whole foundation of that part of the judgment which is in favor of the defendant is, to our judicial knowledge, without any validity, force, or effect, and ought never to have existed. Why, then, should not we reverse the judgment, which we know of record has become erroneous, and save the parties the delay and expense of taking ulterior proceedings in the court below to effect the same object?" The court therefore reversed the judgment of the Circuit Court, and remanded the cause, with directions to enter judgment for the plaintiff in error for the whole amount sued for in the action. On the authority of that case, we entertain no doubt that the decree of the lower court in the present case must be reversed.

Only one other assignment of error need be referred to. That is that the court erred in holding that the claim of the new company against the old in the sum of $141,640.28 was a valid and lawful claim. The determination of the validity of that claim, and all questions concerning the allowance or disallowance of credits for the value of the betterments or improvements placed upon the property by the new company, and the items thereof, if allowed, are involved in the issues presented in case No. 19,209 pending in the state court. As that court had obtained jurisdiction of these issues before the present suit was begun, and the cause is there pending for final determination, all questions involved in that suit should, we think, be left for the adjudication of that court, unaffected by any views that have been expressed in the opinion in the court below. The bill in the present suit prayed for no relief concerning the allowance or disallowance of the claim for improvements, or any of the items thereof, except that it prayed that the appellees be enjoined from charging or suffering to be charged with any claim, lien, or demand any of the properties of the old company. This evidently had reference to the allegations in the bill that the purpose of the original parties to the action on the account stated was to suffer a judgment to be taken therein which should become a lien on the property of the old company. But the case made upon the bill in the Circuit Court involves issues and seeks relief in addition to those which are pleaded in the case in the state court. It may be that the latter court will, in its final decree, afford such relief and so effectually dispose of all the matters in controversy as to leave no necessity for further action in the case in the Circuit Court.

We think that, under the circumstances, the decree of the Circuit Court should be reversed, and the cause remanded, with instructions to await the final disposition of the cause in the state court. Such will be the order of the court.

The following is the memorandum decision of the Circuit Court:

HANFORD, District Judge. It is the opinion of the court that the final decree of the superior court in case No. 19.209 is equally as conclusive and binding upon the parties as to all questions which were or might have been litigated in that case as the decision of the Supreme Court in the case which was prosecuted by Mr. Parsons in behalf of the minority stockholders. That decision did not in terms, nor in legal effect, annihilate any of the stock of the Tacoma Smelting & Refining Company, nor deny the right of the Tacoma Smelting Company (the new company) to transfer the stock which it held, nor preclude its vendees from voting that stock and participating in the business of the old company; and the decree in case No. 19,209 is a judicial determination by a court of competent jurisdiction that Mr. Thorne acquired a majority of the stock of the old company lawfully. That decree has not been attacked for fraud, and this court has no power to set it aside. Therefore the issues in this case are narrowed and limited by the plea of res adjudicata to the question whether the complainants are entitled to any relief in equity by reason of the facts and transactions since the date of that decree, viz., March 6, 1902. These transactions include the election of a new board of trustees, the attempted settlement of accounts between the old smelting company and the new one, the initiation of proceedings to dissolve the old corporation, and the sale of its property.

The election of a new board of trustees is not of itself ground for any complaint whatever. Minority stockholders are certainly entitled to be protected in all their legal and equitable rights, but it is equally true that the major-

ity have the right to prevail in the choice of trustees who are charged with responsibility for managing the business of a corporation. The trustees elected at the meeting of March 7th are all legally qualified, and each of them is a business man of good reputation. Whilst it is true that they were predisposed to be friendly towards the policy of the majority stockholders, and opposed to the confiscation of the investments made in betterments of the smelting plant, on the other hand the evidence does not justify the denunciation of these gentlemen as conspirators to defraud the complainants.

After a patient examination of the pleadings and evidence in this case, and consideration of the arguments and the authorities cited on both sides, and a great deal of deliberation, I am not strongly impressed with the appeal which the complainants are making to a court of equity. The company in which they are stockholders, as a business enterprise, was not a success; and, after contending against adverse conditions for years, it reached a point where it had to give up the struggle, and make a sale of its plant under conditions which meant a sacrifice, or else make some such arrangement, as it did make. The promoters of the new organization did not attempt to "freeze out" the minority stockholders. They secured the capital required to improve the plant, and expended it in the hope of avoiding a complete wreck of the old company; and, after the lease had been adjudged to be invalid, they offered to share with them, on a fair basis in proportion to their holdings, all the advantages of a proposed reorganization of both companies. The minority stockholders refused to do anything to help extricate the old company from its predicament, or to accept any terms offered them, and have ever since shown a disposition to make themselves obnoxious, so as to compel their associates to buy their stock at $100 per share, although when it was originally issued the company only received $50 per share, and it has never been worth in the market more than was originally paid for it.

On the 7th of March, 1902, when the new board of trustees were elected, the company had no friends, and its minority stockholders were actively hostile. There was no money in the treasury with which to carry on a business which, to be successful, requires a large amount of ready cash. It was obvious, therefore, that a sale of the plant and dissolution of the corporation was necessary. This being so, the complainants had a right to apply to a court of competent jurisdiction for the appointment of a receiver, to gather up and dispose of the assets, pay debts, and distribute whatever should remain among the stockholders, and this court might have lawfully taken the property into its custody, through a receiver, for the purposes mentioned; but there is a practical as well as a legal side to this case, and a court of equity is required to exercise a sound discretion in dealing with property of litigants. To illustrate, the value of the property and the price obtainable for it would necessarily be affected by the continued operation or shutting down of the smelter, because the actual operation of the smelter could not be stopped and started again without the loss of a large sum of money, and the interruption of its business would necessarily depreciate its value. Taking these matters into consideration, and also considering that the new trustees were men of good reputation and financial responsibility, the court considered that it could not choose a receiver who would do better for the litigants in protecting their interests, in carrying on the business and disposing of it, than the new board of trustees. The decision of the court denying the application for the appointment of a receiver, made at the beginning of the litigation, commends itself to my mind now, after the final hearing, as being for the best interests of all.

The smelter plant has been sold under the direction of the board of trustees. In their argument upon the final hearing, the solicitors for the complainants disputed the adequacy of the price obtained, but no showing has been made of a probability that upon a resale of the property by a commissioner or agent of this court, under any conditions which might be prescribed, a better price can be obtained. Therefore it is my conclusion that the complainants have not made out a case entitling them to have the court interfere, by the appointment of a receiver or otherwise, with the disposition of the smelting plant, and the court cannot prevent consummation of the dissolution proceedings which have been inaugurated by the holders of the requisite amount of stock.

Only one subject of controversy remains to be considered, and that is the adjustment of the claims of the two companies against each other, in which the new board of trustees admitted and allowed a balance in favor of the new company of $141,000. All questions as to the lawfulness and righteousness or unrighteousness of the settlement referred to are or may be the subject of litigation in an action at law pending in the superior court, in which the new company is plaintiff, and is asking for a judgment for the amount of the balance so agreed to. The fact that the same controversy is involved in a pending lawsuit between the same parties in another court of concurrent jurisdiction does not oust this court of jurisdiction, and, although it may uselessly add something to the burdens of the court, the parties have a right to a hearing and decision. And upon that question it is my opinion that notwithstanding the rule that an intruder upon real estate, or a tenant unlawfully holding over after the termination of his tenancy, cannot compel the owner of the premises to pay the value of improvements made without his consent, the Supreme Court of the United States has recognized the palpable injustice of allowing a corporation which is a party to an ultra vires contract to seize and retain, without paying for it, valuable property transferred or created upon the faith of the contract. In the case of Central Transportation Company v. Pullman's Car Company, 139 U. S. 60, 11 Sup. Ct. 488, 35 L. Ed. 55, I find the following declaration of the law by the Supreme Court: "A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money parted with on the faith of the unlawful contract to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract." That was an action to recover rent upon the covenants of a lease. A judgment of nonsuit was granted on the ground that the lease was ultra vires, and the Supreme Court affirmed the judgment. Before the decision of the Supreme Court holding the lease to be ultra vires had been rendered, the Pullman Company, which was the lessee, filed a bill in equity for an injunction to restrain the lessor from bringing other actions to collect rent, and in that suit the lessor filed a cross-bill asking for a judgment in its favor for the value of the property which it had delivered pursuant to the lease; also for the value of certain contracts and patent rights assigned, and for compensation for the ruin of its business. The Supreme Court sustained the cross-bill, but held that "in no way, and through no channels, directly or indirectly, will the courts allow an action to be maintained for the recovery of property delivered under an illegal contract, where, in order to maintain such recovery, it is necessary to have recourse to that contract. The right of recovery must rest upon a disaffirmance of the contract, and it is permitted only because of the desire of courts to do justice as far as it is possible to the party who has made payment or delivered property under a void agreement, and which, in justice, he ought to recover." For the reasons stated in the above quotation, the judgment of the court below, which was in favor of the lessor, upon its cross-bill, for over $4,000,000, was reversed; the Supreme Court holding that the recovery should be restricted to the actual value of the physical property which the lessee had absorbed. With respect to this branch of the case the court said: "We conclude that the cross-defendant is not liable for the contracts and patents transferred, nor for the possible damage the Central Company may have sustained, as above stated. It is liable for the value of the cars, furniture, etc., transferred. It is a liberal estimate of the value of this property to say that it amounted in 1885 to as much as it did in 1870, yet we are disposed to deal in as liberal a manner with the cross-complainant as we fairly may, while not violating any settled principle of law, in order to give to it such measure of relief as the circumstances of the case seem to justify. We therefore take the value of the property in the cars, etc., in 1885 at the sum of $710,846.50. To that, we think, should be

added the $17,000 cash received from the Central Company, making a total of $727,846.50, and interest from January 1, 1885, for which the cross-defendant is liable, together with costs." Pullman's Car Company v. Transportation Co., 171 U. S. 138, 161, 18 Sup. Ct. 808, 817, 43 L. Ed. 108. Upon the principles of that decision, the Tacoma Smelting & Refining Company had no valid claim to recover from its lessee the profits of the smelting business while the plant was being operated by the latter company, nor to recover anything except property which it parted with on the faith of the contract, or the value of any part thereof which could not be restored, and I hold that the rights of the parties were reciprocal; that is to say, the right of the lessor to recover its property, or compensation for it, is not stronger in equity than the right of the lessee to have compensation for the investments which it made in betterments on the faith of the ultra vires contract. In the eyes of the law the two corporations were equally in fault, and a court of equity will not permit either to appropriate and retain property of the other unconscionably. It is true that the minority stockholders who protested against the lease are entitled to special consideration, and their rights are not exactly the same as the rights of their company. But even they have no standing in a court of equity to unjustly insist upon profiting by a forfeiture. Equity does not favor forfeitures. The value of their interests involved is to be measured by the value of their stock, as it would be unaffected by the ultra vires contract, and they have no just claim for anything more.

This court would not uphold the trustees of a corporation in giving away its property or in creating fictitious debts, whereby the assets might be dissipated; but, in view of the decisions of the Supreme Court of the United States referred to, the trustees of the Tacoma Smelting & Refining Company were not obliged to yield to the demands of the minority stockholders to repudiate all liability to pay for permanent and unmovable additions to the smelting plant which were necessary to the successful operation thereof. The adjustment which was made is, in my opinion, neither unfair nor unlawful. I say it is not unfair, because the promoters will get back less than they put in, deductions were made of estimated depreciation in value of the improvements by use thereof, and a set-off for rent was allowed, and the complainants have not suffered by it in the diminution in value of their stock. They will not receive as large a dividend as they would if the court would lend itself to aid in the confiscation of property created by others, but the amount of their dividend will not be less than the probable value of their stock in 1898 or now, if the ultra vires contract had not been made, unless the amount shall be further diminished by reason of expensive litigation for which they only can be held to be responsible.

I have considered the propriety of retaining the case for final liquidation after the action still pending in the superior court shall have been terminated, but to do so will delay an appeal for an indefinite time, and, in my judgment, it is expedient for the parties to have a final decree entered, which may be appealed from at once.

By reason of an intimation from the court at the time of denying the application for appointment of a receiver, the sale of the smelting plant was postponed, and the terms of the sale were modified. For this reason, I hold that the costs should be divided.

Let a decree be entered dismissing the case on the merits, and awarding to the defendants one-half of their taxable costs.